UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        CRIM. CASE NO. 16-20043

    Plaintiff,

v.

        PAUL D. BORMAN
        UNITED STATES DISTRICT JUDGE

ARTHUR RATHBURN,

    Defendant.

_____/

ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
SEIZED FROM 8640 GRINNELL STREET, DETROIT, MICHIGAN
PURSUANT TO A SEARCH WARRANT

On January 19, 2016, a Federal Grand Jury indicted Defendants Arthur Rathburn and his wife Elizabeth Rathburn. Defendant Arthur Rathburn was charged in all 13 counts; Elizabeth Rathburn was charged in only the first nine counts. The charges were as follows:

<u>Both Defendants: Counts 1-9</u>: Wire fraud, aiding and abetting; 18 U.S.C. §§1343 and 2

<u>Defendant Arthur Rathburn: Count 10</u>: Transportation of Hazardous Material, 49 U.S.C. §46312;
        <u>Counts 11-13</u>: False Statements, 18 U.S.C. (§1001(a)(3)

**BACKGROUND**

The instant search warrant, signed by Magistrate Judge Mona K. Majzoub on December 6, 2013, is for a building located at 8640 Grinnell Street, Detroit, MI 48213: a

1

single story brick and concrete warehouse.  There is a 53-page affidavit in support of the search warrant.  The search at issue is limited to the search of the Grinnell Street warehouse.

The items to be seized include, *inter alia*, dead human bodies and human body parts including organs, tissues, bones, and parts thereof; records or documentation associated with bodies or body parts, fingerprints, DNA tissue samples or swabs, willed-body donor files; records associated with funeral homes, crematories in reference to bodies, domestic and international records of training attendance, shipping records, federal and state government records, any and all items related to, *inter alia*, International Biological, Inc. (a company owned by Mr. Rathburn), Rathburn Properties LLC, Rathburn Brothers LLC, Arthur Rathburn, Elizabeth Rathburn, including photos or videos, travel records, phone records, and barcode scanners.  This includes computer evidence and storage media, software, passwords, hardware, etc.

On August 3, 2016, Defendant Arthur Rathburn filed a Motion to Suppress the evidence seized accompanied by a 35-page brief.  Co-Defendant Elizabeth Rathburn did not join in this Motion. On September 16, 2016, the Government filed its response in opposition to Defendant Arthur Rathburn's Motion to Suppress.  Pursuant to E.D. Mich. L. R. 7.1(f)(2), the Court concludes that it is proper to rule without a hearing based on the four corners of the search warrant and the affidavit.

## PRELIMINARY ANALYSIS[1]

A recent Sixth Circuit opinion authored by Judge Jeffrey Sutton, *United States v. Raglin*, F. App'x ___, 2016 WL 5754008, (6th Cir. Oct. 4, 2016) (unpublished), discusses the legal issues facing this Court in this Motion to Suppress:

> Probable Cause. To justify a search, an officer must demonstrate "why evidence of illegal activity will be found in a particular place." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). There must be a connection between the location of the search and the subject of the search.
>
> \* \* \*
>
> Particularity. The Fourth Amendment requires a search warrant to "particularly describe[] the place to be searched, and the... things to be seized." The chief concern of the requirement is to prevent "[g]eneral warrants," which "create a danger of unlimited discretion in the executing officer's determination of what is subject to seizure." *United States v. Henson*, 848 F.3d 1374, 1382 (6th Cir. 1988) (quotation omitted). The chief answer to that concern is to "require[e] a neutral judicial officer to cabin the scope of the search to those areas and items for which there exists probable cause that a crime has been committed." *Baranski v. Fifteen Unknown Agents of the Bureau of Alcohol, Tobacco & Firearms*, 452 F.3d 433, 441 (6th Cir. 2006) (en banc).
>
> The degree of specificity required in a search warrant varies depending on (1) "what information is reasonably available to the police," *United States v. Ford*, 184 F.3d 566, 575 (6th Cir. 1999), (2) "the crime involved," as well as (3) "the types of items sought," *United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011).

---

[1] When this Opinion references Rathburn, it refers to Arthur Rathburn. Any discussion of the co-Defendant references Elizabeth Rathburn.

3

2016 WL 5754008, at *2-3.

While the Court recognizes that this search warrant lists many items to be seized, this is neither unusual nor illegal given the broad criminal investigation related to multiple bodies/body parts, and multiple individual actors, entities, and locations. The Court notes that the Grinnell Street structure appears to be a hub of the illegal activity. The items seized were clearly covered by the search warrant and relevant to the ongoing criminal investigation.

With regard to the length of the investigation, the Court concurs with the United States description in it's Response of the ongoing criminal activities: "This is not an investigation involving ephemeral evidence [lasting briefly], such as illegal drug transactions. It is an investigation of the illegal dealings of an ostensibly legitimate business – and as such there are no staleness concerns." (ECF No. 49, p.9) (alteration added). Further ¶62 on Page 29 of the affidavit evidences Rathburn/IBI's attempt to send body parts into Canada as recently as in October, 2013, that were rejected by Canada as diseased.

In this case the affidavit established an adequate connection between the Grinnell Street location, the nefarious criminal activity described in the affidavit, and the Federal crimes specified in the affidavit at Page 52, ¶117, Title 18 U.S.C. §§371, 1343, 2314, and 1001.

Further, as to the challenge of the warrant being open-ended, Judge Sutton pointed

out in *Raglin*: "Relatedly, other circuits have held that specifying that a search is for evidence of a particular crime can bring an otherwise open-ended list of items into compliance with the particularly requirement." 2016 WL 5754008, at *3. The Court recognizes that there is a legitimate market involving body donors, and commercial entities supplying cadavers and body parts to *inter alia*, Researchers and Universities. However, the instant search warrant affidavit is specifying criminal activity: "a vast gray and black market in dead human bodies and body parts [that] necessarily has many moving parts and players. This market is run by an organized group of international entrepreneurs buying, selling, and transporting human body parts throughout the United States and around the world." Affidavit ¶9, p.5.

The affidavit asserts that the facts contained therein "establish probable cause that evidence, fruits, and instrumentalities of violations of conspiracy to commit wire fraud, interstate transportation of stolen property, and deception of the United States Government through false statements (Title 18, United States Code, sections 371, 1343, 2314, 1001) will be found at 8640 Grinnell Street. . . ."

The affidavit defines "body-brokers" as "middlemen between those who first receive corpses and the end-users who are willing to pay handsomely for a steady supply. Although the activity of "body brokers" who buy and sell human cadavers, body parts and tissue – is not illegal, *per se*, – body broker business conducted in violation of Federal criminal statutes is the focus of this affidavit.

8640 Grinnell Street is a business address of International Biological, Inc., a Rathburn-owned entity, "where human body parts are processed and stored, and . . . this property is associated with International Biological, Inc. (I.B.I.), and [According to Wayne County Register of Deeds website] has listed both Arthur Rathburn and Rathburn Properties, LLC as grantees." Affidavit ¶4, p.3.

The affidavit also references "Body Broker" business entities located in other venues that have dealings with IBI: Illinois – Anatomical Services, Inc., Cremations Services Inc., and Biological Resource Center of Illinois, LLC, (BRCIL): Arizona – Biological Resource Center of Arizona (BRCAZ). Affidavit ¶¶ 5-7, p.4. Given the complexity of the criminal conduct alleged, in terms of the various entities involved and the many moving parts in this nationwide investigation, the Court concludes that the search warrant was not an illegal general warrant, nor did it authorize an over broad unlimited search.

The Government's Response to Defendant's Motion to Suppress, contends, as is evident from reading the affidavit, that the Grinnell Warehouse was a hub of the international network of illegal buyer/seller activity relating to the buying, selling and disposing of body parts contrary to the will of donors.

The affidavit was authored by an individual who became an FBI Special Agent in 2003, who has a Ph.D in the biological services, and prior to 2003 worked as a research scientist at the Center for Behavior Neuroscience. Affidavit ¶ 1, p.2. That background,

while relevant to the credibility of the affidavit's discussion of scientific matters with regard to the business activity, doesn't give the Government a free pass in the Fourth Amendment analysis, so the Court proceeds to analyze the substantive content of the affidavit and the search warrant.

Rathburn's business is International Biological Inc., (IBI) which has a business office on one side of a duplex located at 784 Harcourt Rd, Grosse Pte. Park, MI, and a residential side. Rathburn also owns the Grinnell Street building, the subject of the search, which is the location of the bodies/parts and records.

IBI received cadavers and severed human remains from BRCAZ: (President Stephen Gore, Sally Gore, Secretary). The affiant's review of Arizona death certificates, combined with an Arizona Federal grand jury subpoena, revealed that many body items were not legally donated to science per the donors' request. This included body parts sourced from BRCAZ and transported by Rathburn's IBI. IBI also received body remains from Anatomical Services, Inc. (ASI) of Illinois.

Of particular relevance to the instant search warrant of Rathburn's Grinnell Street warehouse was a February 2012 incident, noted in ¶55 of the affidavit. The U.S. Centers for Disease Control (CDC) received a fax from Rathburn's Company, IBI, on February 20, 2012, concerning a shipment of human heads/necks from Israel to Detroit, containing a signed statement of non-infectiousness (¶41, p.20). The shipment arrived on February 26, 2012. A review of death certificates revealed that one of the heads was sourced from

an individual whose cause of death was listed as "sepsis, unknown bacteria" due to or as a consequence of "aspiration pneumonia, bacteria not identified" (¶55, p.24). Significantly, when Defendant Rathburn was questioned about that Detroit shipment by CDC and Department of Homeland Security Agents (DHS) on March 13, 2012, he made false statements, to wit, that:

> (1) the heads had been embalmed
> (2) there was no blood in the coolers, but that it was Listerine, and
> (3) that he packaged the heads himself in Israel. ¶45, p.21.

On March 19, 2012 three presumptive blood tests were conducted on the red liquid in each cooler and all test results were positive for the presence of blood: tests conducted for Listerine were negative. ¶46, p.21. On May 2, 2012, Rathburn's attorney sent a response to CBP regarding all eight donors, which refuted Rathburn's earlier statement, and admitted that the specimens were not embalmed – just soaked in 5% mouthwash and infused with water. ¶53, pp. 23-24.

Additional fraudulent allegations supporting the issuance of the search warrant for Rathburn's Grinnell Street building are contained in ¶55, pp. 24-25, that reveals several discrepancies in documents, for example:

> a. "The official death certificate for Donor BRCAZ 1006024 lists the cause of death as 'sepsis, unknown bacteria,' due to or as a consequence of 'aspiration pneumonia, bacteria not identified,' but BRCAZ and IBI paperwork both listed the cause of death as Parkinson's disease. BRCAZ literature and website lists sepsis as a denied condition that will preclude body donation. The disclaimer originally faxed to the CDC

8

> by IBI states 'we hereby certify that, to the best of our knowledge, the human anatomical material are not known or suspected to contain an etiological agent, host, or vector of human disease.'"

Further, Section F at ¶57, p.26 of the affidavit is titled: "seized Shipment of 18 Human Heads in Chicago, December 2012/January 2013." This section discusses the December 14, 2012 shipment of 18 human heads from Italy to Chicago, intercepted by BPC at O'Hare Airport. According to the entry documents, the contents were "Exempt Human Specimen (18 Head/Neck) with a declared value of $18." While the importer was Biological Resource Center of Illinois, an email chain provided by the broker to CBP (¶58, p.27) shows that the shipment was the joint responsibility of BRCIL, BRCAZ, and Rathburn's IBI:

> In an email dated December 21, 2012, Donald Greene II [of BRCIL] emailed both Beth Rathburn and [BRCAZ president] Steve Gore . . . stating that "Specimen descriptions can be provided by IBI" and that Beth from IBI should be able to provide more information. . . . An email dated January 3, 2013 from Beth Rathburn to Donald Greene II and the customs broker states, "IBI never received any of the non-redacted documents. Steve and Don sent those directly to you and Toni." This email is signed "Beth Rathburn, Coordinator International Biological, Inc."

Per ¶59, pp. 27-28, on January 14, 2013 the Government (CSP and HSI) removed the heads to the Cook County, IL Medical Examiner's Office where they were inspected and found two discrepancies:

> 1. That the human head labeled 510A00941 was listed as female but appeared to be male, and

9

      2. That the human head labeled BRC12101126 appeared to be much older than the age listed.

Per ¶60, p.28, the documentation regarding the 18 human heads has a fax record on the top, showing that they were faxed from BRCAZ . . . to IBI (313-821-5626) on November 20, 2012, and again from IBI to an unknown recipient on November 21, 2012. The affidavit then lists several critical discrepancies between the Arizona Transit Permits for Donors and the causes of death, the sex of the body, donor restrictions, serology test results, dates of death, and the primary and/or secondary causes of death did not match between the GIDS and the death certificates for thirteen (13) of the remaining human heads. Certainly, these facts evidence false statements by IBI and others.

In ¶61, p.29, the affidavit concludes that these facts represent an effort by BRCAZ/BRCIL and IBI to defraud donors and doctors that would be training with the donated body parts. This is a justifiable conclusion based on the contents of the affidavit.

Page 29, ¶62 of the Search Warrant, discusses an event that occurred in October 2013, just two months before the issuance of the search warrant on December 6, 2013, titled: <u>F. Rejected Shipments of Human Heads and Facial Blocks, October 2013</u>.

Paragraph 62, p.29 of the affidavit states that the U.S. Center for Disease Control faxed the affiant "records showing that [Rathburn's] IBI attempted two shipments of human body parts into Canada in October 2013." [less than two months before the warrant was issued].

One shipment, evidenced that "Donor BRCIL - 2012006 suffered from 'Recent

10

Sepsis' as a condition leading to death. According to BRCIL's own protocols . . . <u>sepsis</u> is an automatic disqualifying condition for donation." ¶62 , p.29.

The second shipment is described in ¶ 64, pp. 29-30:

> "The second IBI shipment contained six (6) human heads all originating from Phoenix, Arizona-based Research For Life (RFL). The California death certificate for Donor RFL-13-13-536 shows that the individual had 'HIV, AIDS' among other medical conditions. The attached serology results, however, show that the donor blood sample was non-reactive to Anti-HIV-1/2. Your affiant knows through training and experience that criminals in the human body parts trade will substitute "clean" blood samples to hide serious contagious disease. It is highly unlikely that someone with both HIV and full-blown AIDS would not test positive for HIV.

¶65, p.30 stated that "The Public Health Agency of Canada rejected both of these IBI shipments and would not allow them into the country." ¶67, p.30 states:

> On 2/15/2012 your affiant received an administrative copy of a Michigan death certificate signed by Arthur Rathburn from the Michigan Office of the State Registrar. The death certificate, that of Thomas W. McMahon, date of death 11/21/2006, lists the method of disposition as "Donation," the place of disposition as "IB Tissue Bank," the location as "8640 Grinnell, Detroit, MI, "and the name and address of funeral facility as "Arthur L. Rathburn, 15234 E. Jefferson, Grosse Pointe Park, Michigan." IB Tissue Bank is a fictitious business name and is not registered in any state. 15324 [sic] E. Jefferson is not, and was not, a licensed funeral facility at the time of this death certificate. It is your affiant's belief that this represented a way of defrauding Mr. McMahon and his next of kin and represent false statements on an official government document.

The fictitious IB Tissue Bank and other false statements evidence affirmative actions

11

done by Rathburn to cover up fraudulent criminal activity.

Beginning with Page 34, Section J <u>Confidential Human Source Reports</u>, the affidavit contains statements to the affiant from three Confidential Human Sources (CHS) who:

> provided information completely voluntarily without any financial compensation and/or promises of financial compensation. All have provided information because they believe that the subjects of this investigation are participating in unethical and/or illegal acts. None of the CHS discussed below have been convicted of any crimes or are currently in trouble with law enforcement.

¶J, Footnote 1, p.34.

In ¶76, p.35 CHS-1, a professional in a willed-to-science program for over 15 years told the affiant that he attended a meeting of the Michigan Funeral Directors Association where he heard Arthur Rathburn say that, unlike universities, he would accept bodies of people with HIV or hepatitis.

In ¶78, pp. 35-36, CHS-2, a former IBI employee

> whose reporting has been corroborated by independent investigation, stated that both Arthur and Beth Rathburn wanted IBI employees to fabricate information regarding the shipment from Israel that had been seized by CBP and CDC [see above]. They wanted their employees to lie to the CDC and say that everything was fine and they worked with the broker over in Israel to make sure everything was prepared properly for shipment. In reference to the seized shipment of February 2012, CHS-2 overheard Arthur Rathburn tell Beth Rathburn that he did not pack the boxes himself in Israel. See paragraph 45 above where Rathburn told CBP/CDC that he did.

¶78 pp. 35-36.

> Page 37 ¶81 discussed CHS-3, an IBI employee
>
>> who has provided information that has been independently corroborated through FBI investigation stated that Arthur Rathburn disposes of human biological waste down the drain and in the regular garbage at IBI's Detroit facility [8640 Grinnell Street, Detroit MI] contrary to all of his statements that he abides by all local, state and federal regulations. When Rathburn sends the body for cremation, not all of the body is sent. Rathburn keeps some of the parts for later use – these are not returned to the family.
>
> In ¶85, pp. 37-38.
>
>> CHS-3 explained that Rathburn has continued to use the head and neck of a donated body even though the rest of the body had already been cremated. Rathburn has said to CHS-3 that when he cremates a body he is only talking about the torso. The head, neck, arms and legs are never sent back to the family. The families are not told that they are only getting back part of their loved ones; they believe they are getting the whole body back. The donor consent form for IBI states that IBI is authorized to use specific body parts for other purposes. The consent form does not say that IBI will keep any of the anatomical material. Beth Rathburn handles direct donations.

The Court finds that the affidavit establishes the credibility of the three confidential human sources, two clearly identified as having worked with Rathburn and one a professional who heard him speak at an industry conference. None are criminals or anonymous tipsters. Their remarks complement and corroborate other assertions in the affidavit.

With regard to justifying seizure of "Computers, Electronic Storage, and Forensic

Analysis" as described in Section V of the affidavit beginning with ¶112, p.45, the Court finds that such devices will be likely to be found on the premises of this active body parts business location where in carrying out the business, many documents have been created, received, and mentioned. This is a document-intensive business involving bodies/body parts/donors/BRCIL, BRCAZ, activity/CBP, DHS activity – and there certainly is a justifiable basis to locate and seize computers and storage mediums from that location.

The Court agrees with the affiant's analysis of the instant criminal allegations and the seizure justification contained in ¶114(f) on page 49:

> [W]hen an individual uses a computer to prepare and electronically submit fraudulent forms and paperwork, the individuals computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime . . . an instrumentality . . . because it is used as a means of committing the criminal offense . . . also likely to be a storage medium for evidence of crime.

The Court also agrees with the affiant's discussion in ¶115 on Page 50 of the need to seize or copy entire computers on storage media to examine for evidence and to prevent loss of the evidence contained therein.

**LEGAL CONCLUSION**

In *United States v. Allen*, 211 F.3d 970 (6th Cir. 2000) (en banc), the Sixth Circuit applied the Supreme Court's principles handed down in *Illinois v. Gates*, 462 U.S. 213 (1983): a "totality of the circumstances" approach in reviewing the sufficiency of an affidavit underlying a search warrant. In applying that approach, the majority noted:

> *Gates* also guides our deference to the issuing magistrate's determination of probable cause: "line-by-line scrutiny [of an underlying affidavit is] . . . inappropriate in reviewing [a] magistrate's decisions." *Gates* at 246, n.14. . . . Rather, reviewing courts are to accord the magistrate's determination "great deference."

*Allen*, 211 F.3d at 973.

> This circuit has long held that an issuing magistrate's discretion should only be reversed if it was arbitrarily exercised.

*Id.* at 973.

The *Allen* decision further noted, regarding corroboration, that a CI's [confidential information] information need not always "be independently corroborated by police, or that an affidavit must in every case set out and justify a CI's expertise in identifying the particularities of the criminal activity alleged." 211 F.3d at 974. Further, the *Allen* majority emphasized:

> The affidavit is judged on the adequacy of what it does contain, not on what it lacks, or what a critic might say should have been added.

*Id.* at 975.

The instant affidavit to the search warrant signed by Magistrate Judge Mona Majzoub clearly passes the *Gates* totality of circumstances test.

Finally, even if the instant affidavit is deemed insufficient, this Court concludes that the evidence should not be suppressed under *United States v. Leon*, 468 U.S. 897 (1984). As the concurring opinion in *Allen* pointed out in discussing *Leon*:

15

>In *Leon*, the Supreme Court held that the exclusionary rule does not "bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." The proper test of an officer's good faith is "whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization."

211 F.3d at __.

In the instant case, the Court concludes that the affidavit evidences significant efforts by the affiant to amass abundant valid evidence to support the search of the Grinnell Street structure. Thus, even if this search warrant were to be found deficient, the evidence seizure should be admitted, under *Leon*, based on the affiant's good faith reliance on the search warrant.

Accordingly, the Court denies Defendant's motion to suppress the evidence seized pursuant to the search warrant at the 8640 Grinnell Street building in Detroit, Michigan.

SO ORDERED.

DATED: OCT 11 2016

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE