UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                 Criminal No.  16-CR-20043

        v.                        Hon. Paul D. Borman

ARTHUR RATHBURN,

        Defendant.
_____/

**United States' Response Opposing
the Defendant's Motion for Compassionate Release and
Request for Home Confinement (ECF No. 214)**

After a trial by jury, Arthur Rathburn was convicted of seven

counts of Wire Fraud (18 U.S.C. § 1343) and one count of

Transportation of Hazardous Material (49 U.S.C. § 46312).  He was

acquitted of two counts of wire fraud and two counts of making false

statements (18 U.S.C. § 1001(a)(2)).  On May 22, 2018, this Court

sentenced Rathburn to 108 months in prison, followed by three years of

supervised release. (ECF No. 156, PageID.2115-2123.)  In part due to

time served awaiting trial, Rathburn has served, approximately, 50% of

his sentence.  Assuming credit for good time, he is not scheduled to be

1

released until November of 2023 (*See* Rathburn BOP Public

Information, Exhibit A pg. 001)

Rathburn now seeks compassionate release to home confinement

under 18 U.S.C. § 3582(c)(1)(A).[1] His motion should be denied.

Rathburn does not satisfy the statutory, substantive requirements

for compassionate release. "[T]he mere existence of Covid-19 in society

and the possibility that it may spread to a particular prison alone

cannot independently justify compassionate release." *United States v.*

*Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Even assuming a defendant

facing a heightened risk from Covid-19 could demonstrate

"extraordinary and compelling reasons" for release, Rathburn cannot do

so. While he cites several medical conditions as grounds for his release,

none of them are recognized by the CDC as factors leading to increased

risk from Covid-19, and several claimed conditions are not even

documented by his medical records. His reasons for release are

therefore not "extraordinary."

---

[1] It is not clear whether Rathburn only seeks home confinement or if he is also seeking unconditional release.  His motion is ambiguous, but his original request to the BOP sought only home confinement. (*See* Rathburn Request to BOP, Exhibit B at 006, filed under seal.) If Rathburn is seeking unconditional release, as opposed to home confinement, that claim is not exhausted, as he never made such a request to the BOP.

Even if the Court were to find that Rathburn has established "extraordinary and compelling reasons" establishing eligibility for *potential* release, the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—do not support granting him relief. Releasing him now would cut approximately three years off his imprisonment; such relief would not be consistent with the § 3553(a) analysis that led to the Court's 108 month sentence.

The Bureau of Prisons has also taken significant steps to protect all inmates, including Rathburn, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of November 23, 2020, this process has already resulted in the BOP releasing at least 137 inmates who were sentenced in the Eastern District of Michigan. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public

safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 961 F.3d at 845—the Court should deny Rathburn's motion for compassionate release.

## Background

Arthur Rathburn was the founder and principal of International Biological, Inc. ("IBI"), a corporation that supplied human cadavers and other anatomical specimens. Medical professionals used human remains sourced from IBI for training. For example, Rathburn supplied cadavers that were dissected to demonstrate neural pathways to anesthesiologists. He also supplied human heads used to train dental surgeons. Rathburn promised customers that he would test and screen cadavers for HIV and hepatitis. Unbeknownst to his customers, however, he sought out discounted remains that had tested positive for these diseases—and supplied them without either informing customers of the positive test results or passing on the discounts. Rathburn also promised customers that he would process his specimens in a "clean" environment. This was a lie. Rathburn's warehouse was filthy, and he failed to observe industry standard sanitary practices connected to the dismembering and storage of human remains.

4

## Argument

**I. The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

### A. The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

On March 13, 2020, the Bureau of Prisons started modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are

5

isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. When visitation is permitted at an institution, the visits are non-contact, require masks, and social distancing between inmates and visitors is enforced, either via the use of plexiglass (or similar barriers), or physical distancing (i.e., six feet apart). Visitors are screened for Covid-19 symptoms and their temperature is checked. Visitors who are sick or symptomatic are not allowed to visit, and inmates in quarantine or isolation cannot participate in social visiting. *See* BOP Modified Operations. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month, and legal visits are accommodated upon request. *See* BOP Modified Operations.

6

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

### B. The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to

consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. As of December 15, 2020, the Bureau of Prisons has 7,996 inmates on home confinement, and the total number of inmates placed in home confinement from March 26, 2020 to December 15, 2020 (including inmates who have completed service of their sentence) is 18,859. BOP Coronavirus FAQs. As the Sixth Circuit stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

1.) Each inmate's age and vulnerability to Covid-19;

2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

8

3.) Whether the inmate's release into home confinement would risk public safety.

([03-26-2020 Directive to BOP](); [04-03-2020 Directive to BOP]()). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, *en masse*. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious

9

offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 961 F.3d at 845, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now

10

and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, 452 F.Supp.3d 705, 712 (E.D. Mich. 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II. The Court should deny Rathburn's motion for compassionate release.

Rathburn's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529

F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). And as the Sixth Circuit has held, this statutory exhaustion requirement is mandatory. *Alam*, 960 F.3d at 832–36.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for release. 18 U.S.C. § 3582(c)(1)(A). The defendant's "generalized fears of contracting Covid-19, without more," do not satisfy this requirement. *United States v. Jackson*, 2020 U.S. App. LEXIS 32269, at *6 (6th Cir. Oct. 13, 2020);

*accord United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *2 (6th Cir. May 21, 2020).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020). As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

## A. Binding authority prohibits the Court from granting complete release, because Rathburn has not satisfied the statutory exhaustion requirement with respect to complete release.

To the extent that the Court interprets Rathburn's motion as requesting complete release (as opposed to just home confinement), it should be dismissed as to that remedy because he has not satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Until recently, only the Bureau of Prisons could move for compassionate release. The First Step Act of 2018 amended the

13

statute, permitting defendants to move for it too. First Step Act §
603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018).

But the provision permitting a defendant-initiated motion
includes an exhaustion requirement. *Id.* A district court may not grant
a defendant's motion for compassionate release unless the defendant
files it "after" the earlier of (1) the defendant "fully exhaust[ing] all
administrative rights to appeal a failure of the Bureau of Prisons to
bring a motion on the defendant's behalf," or (2) "the lapse of 30 days
from the receipt of such a request by the warden of the defendant's
facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831,
832 (6th Cir. 2020). As the Sixth Circuit held in *Alam*, this statutory
exhaustion requirement is "a mandatory condition" that "must be
enforced" when the government raises it. *Id.* at 832–36; *accord United
States v. Raia*, 954 F.3d 594, 595–97 (3d Cir. 2020).

If Rathburn is requesting that the Court grant him complete
release, this request should be denied because he did not comply with
§ 3582(c)(1)(A)'s mandatory exhaustion requirement as his original
request to the BOP asked only for home confinement. (*See* Rathburn

14

Request to BOP, Exhibit B at pg. 006, filed under seal.) *Alam*, 960 F.3d

at 836.

### B. Rathburn has not shown "extraordinary and compelling reasons" for compassionate release.

Regardless of how the Court interprets Rathburn's request, either

release to home confinement or complete release would be improper.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A),

contains two overlapping requirements for scrutinizing an inmate's

initial eligibility for release. First, an inmate must demonstrate that

"extraordinary and compelling reasons" warrant a reduction in his

sentence. *Id.* Second, release must be "consistent with applicable policy

statements issued by the Sentencing Commission." *Id.* That applicable

policy statement *should* be USSG § 1B1.13, which contains various

criteria related to a defendant's medical conditions, age-related issues,

family circumstances, or other reasons, USSG § 1B1.13 cmt. n.1, and

which requires that the defendant "not [be] a danger to the safety of any

other person or to the community," USSG § 1B1.13(2). That policy

statement should be binding here, as the analogous policy statement in

USSG § 1B1.10 is for sentence reductions under 18 U.S.C. § 3582(c)(2).

*See Dillon v. United States*, 560 U.S. 817, 819 (2010); *United States v.*

*Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). Recently, however, a Sixth Circuit panel concluded in *United States v. Jones*, ___ F.3d ___, No. 20-3701, 2020 WL 6817488, *6 (6th Cir. Nov. 20, 2020), that § 1B1.13 is not "applicable"—and thus does not apply at all—to defendant-initiated motions for compassionate release.

*Jones*'s analysis on that point was incorrect, and the government preserves for further review its argument that USSG § 1B1.13 is binding here and that Rathburn has failed to satisfy its requirements, because he has not documented a medical condition recognized by the CDC as placing him at increased risk. Further, as Judge Cook's concurrence made clear, the *Jones* panel's discussion of § 1B1.13 was dicta. *Jones*, 2020 WL 6817488, at *13 (Cook, J., concurring). The only holding in *Jones* was that the district court there did not abuse its discretion in denying release based on the § 3553(a) factors. *Id.* So the remainder of the panel's opinion is not binding. *See Wright v. Spaulding*, 939 F.3d 695, 700–02 (6th Cir. 2019) (explaining that "only holdings" and "not dicta" are binding in subsequent cases).

But even if the Court were to follow the dicta in *Jones*, Rathburn has not satisfied the statutory requirement of showing that

16

"extraordinary and compelling reasons" warrant a sentence reduction. Even if not mandatory, § 1B1.13 continues to "provide a working definition of 'extraordinary and compelling reasons,'" which can "guide" a district court's decision "without being conclusive." *United States v. Gunn*, ___ F.3d ___, No. 20-1959, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020). And even without § 1B1.13, the plain language of the compassionate-release statute does not permit "a sort of Wild West" or allow "every district judge [to] hav[e] an idiosyncratic release policy." *Id.* The analyses of the Sentencing Commission, as represented in § 1B1.13 and its Application Notes, and the BOP Director should still be "given substantial weight," and "strik[ing] out on a different path risks an appellate holding that judicial discretion has been abused." *Id.*; *see also Jones*, 2020 WL 6817488, at *9 (quoting with approval a prior panel's observations that "'discretion' does not mean 'whim'" and "[a] court might abuse its discretion, for example, if it misreads the meaning of the extraordinary-reason requirement").

That statutory language, rather, requires that a defendant satisfy two strict criteria to be initially eligible for compassionate release. 18 U.S.C. § 3582(c)(1)(A)(i). *First*, the defendant's reasons must be

17

"extraordinary"—meaning exceptional or uncommon. *United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020); *United States v. Sapp*, No. 14-CR-20520, 2020 WL 515935, at *3 (E.D. Mich. Jan. 31, 2020). *Second*, the defendant's reasons must be "compelling"—meaning "so great that irreparable harm or injustice would result if the relief is not granted." *Sapp*, 2020 WL 515935, at *3. A defendant must establish both criteria to satisfy the statute's eligibility threshold. Rathburn has not done so.

*First*, Rathburn's reasons for release are not "extraordinary." *Everyone* in our society faces a risk from Covid-19. Over 300,000 Americans have now died from this terrible disease. So as the Sixth Circuit has stressed, "generalized fears of contracting Covid-19, without more," do not justify compassionate release. *United States v. Jackson*, 2020 U.S. App. LEXIS 32269, at *6 (6th Cir. Oct. 13, 2020); *accord United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *2 (6th Cir. May 21, 2020); *United States v. Ramadan*, No. 20-1450, 2020 WL 5758015, at *2 (6th Cir. Sept. 22, 2020). The Bureau of Prisons has also worked diligently to implement precautionary measures reducing the risk from Covid-19 to Rathburn and other inmates. *See Wilson v.*

18

*Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 961 F.3d at 845.

Because Rathburn does not have a chronic condition that the CDC has confirmed will cause him to face an increased risk of severe illness from Covid-19, his reasons for release are not "extraordinary" and instead present only a "generalized fear[] of contracting Covid-19." *Jackson*, 2020 U.S. App. LEXIS 32269, at *6. The CDC maintains a running list of conditions that are known to place someone at a higher risk of severe illness from Covid-19. *See* CDC Risk Factors (as updated) (identifying the confirmed medical conditions that increase someone's risk from Covid-19).

Rathburn maintains that he is at increased risk for Covid-19 because of several claimed medical conditions. (*See* ECF No. 214, PageID.3654.) But, while his medical records do demonstrate that he is not in perfect health, none of Rathburn's documented medical

conditions have been confirmed by the CDC to place him at increased risk during the pandemic. This was recognized by the Bureau of Prisons, which in denying Rathburn's request for release noted that he had no qualifying medical conditions. (*See* Rathburn BOP Denial, Exhibit C pg. 032.)

The lead medical complaint in Rathburn's motion is psoriatic arthritis. (*See* ECF No. 214, PageID.3654.) This condition is documented in Rathburn's medical records, but the CDC does not recognize it as a condition that increases Covid-19 risk. *See* CDC Risk Factors. The government was able to identify two medications that Rathburn is taking, Remicade and Methotrexate, that are potentially immunocompromising. (*See* Rathburn 2020 Medical Records, Exhibit D at pgs. 109, 131) But the only immunocompromising factor recognized by the CDC as creating increased risk for Covid-19 is solid organ transplant. *See* CDC Risk Factors. The CDC has only identifies medication-related immune system compromise as a condition that "might" increase risk. *Id.* It is therefore only speculation that the medications Rathburn is taking increases his risk for Covid-19, and

speculation does not qualify as an "extraordinary" reason deserving of relief."

The government can find no support in Rathburn's medical records for the further medical concerns listed in his motion—that his psoriatic arthritis is "pre-cancerous," that he has poor kidney function, and that he is "easily susceptible to influenza, pneumonia and other lung infections." The government has located no reference to Rathburn's psoriatic arthritis in his prison medical records that describe it as "pre-cancerous." The only references to Rathburn's kidney function that the government has identified describe it in a normal range. (*See* Rathburn 2020 Medical Records, Exhibit D at pgs. 204, 222, 227, 230, 235, 241.) And, while Rathburn apparently has latent tuberculosis, his lung function has been noted as normal and every reference to a lung exam in his 2020 medical records has been coded as CTA B/L (clear to auscultation bilaterally, meaning no abnormality was detected). (*See Id.* at 052, 068, 072.)

Rathburn, therefore, does not have a CDC recognized condition placing him at increased risk, and thus his medical concerns do not rise to the level of an "extraordinary" circumstance.

21

*Second*, Rathburn's reasons for release are not "compelling." In the pretrial-release context, the Sixth Circuit has already addressed what qualifies as a "compelling" reason for release based on Covid-19. *United States v. McGowan*, No. 20-1617, 2020 WL 3867515, at *2 (6th Cir. July 8, 2020); *Bothra*, 2020 WL 2611545, at *2. That analysis considers (1) the "original grounds" for the defendant's incarceration; (2) the "specificity" of his "stated Covid-19 concerns"; (3) the extent to which the proposed release plan would "mitigate or exacerbate" his risk from Covid-19; and (4) the risk from Covid-19 that his release would pose to others. *McGowan*, 2020 WL 3867515, at *2. In *Bothra*, for instance, the defendant was in his 70s and "had health issues rendering him more vulnerable to contracting [Covid-19]." 2020 WL 2611545, at *2. But he was a flight risk, had orchestrated a large and complex fraud scheme, and was detained at a facility that had very few cases of Covid-19. *Id.* The Sixth Circuit thus held that his circumstances did not present a "compelling" reason for release. *Id.* And unlike the pretrial defendant in *Bothra*, Rathburn was *convicted* of his offense here—not just accused of it. So the justice system's "essential" interest in finality

22

weighs far stronger against Rathburn's release than it did the defendant's release in *Bothra*. *Teague v. Lane*, 489 U.S. 288, 309 (1989).

Rathburn's circumstances are even less compelling than those rejected in *Bothra*. The "original grounds" for Rathburn's incarceration was a decade-plus scheme that risked the health of medical providers and researchers. Rathburn's crimes involved ignoring health and safety precautions, as well as regulations concerning the shipment of infectious biological material—making him particularly unsuitable for release during a world-wide pandemic that demands scrupulous observance of public health precautions.

Finally, in considering whether Rathburn's reason is "compelling" the Court should take into account that Rathburn was detained pending trial for inability to comply with his pre-trial conditions for release. The Court revoked Rathburn's bond after it found that Rathburn had violated a no-contact order and would be a "clear and convincing danger" to a co-defendant if he remained on pretrial release. (ECF No. 32, PageID.115.) This demonstrated inability to comply with court orders and societal norms creates an even increased risk that, if released, Rathburn would not comply with conditions of supervised

23

release, not observe Covid-19 social distancing procedures, and pose a

danger to others (such as his former co-defendant).

### C. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling

reasons," he is still not entitled to compassionate release. Before

ordering relief, the Court must consider the factors set forth in 18

U.S.C. § 3553(a) and determine that release is appropriate. 18 U.S.C.

§ 3582(c)(1)(A). A defendant's failure to establish that the § 3553(a)

factors support relief is an independent basis for denying compassionate

release. *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020);

*accord United States v. Austin*, 825 F. App'x 324, 325–27 (6th Cir. 2020)

(upholding a district court's denial of compassionate release based on

the § 3553(a) factors); *United States v. Kincaid*, 802 F. App'x 187, 188–

89 (6th Cir. 2020) (same). So even if the Court were to find that

Rathburn established extraordinary and compelling reasons for his

release, the § 3553(a) factors should still disqualify him.

For starters, Rathburn's remaining sentence weighs heavily

against release. This Sixth Circuit has repeatedly upheld the denial of

compassionate release under § 3553(a) when a defendant has a long

24

remaining sentence, including in a recent published decision. *Ruffin*, 978 F.3d at 1008; *accord Kincaid*, 802 F. App'x at 188–89; *Austin*, 825 F. App'x at 326; *see also United States v. Kincaid*, 805 F. App'x 394, 395–96 (6th Cir. 2020) ("[W]e don't think [the defendant] raises a close question."). This is because the original sentence already reflects the district court's evaluation of "the need to provide just punishment, the need to reflect the seriousness of the offense, and the need to promote respect for the law" under § 3553(a). *Kincaid*, 802 F. App'x at 188; *accord Ruffin*, 978 F.3d at 1008. Releasing Rathburn now would cut his sentence nearly in half—a substantial, and unjustified relief that creates a disparity with the § 3553(a) analysis that led this court to sentence him to 108 months in prison.

The plain language of the compassionate-release statute makes the point even more directly: it requires that the defendant's reasons for release "warrant such a reduction" in his sentence. 18 U.S.C. § 3582(c)(1)(A)(i). That inquiry depends, at least in part, on the length of time remaining on the defendant's sentence, requiring him to justify the magnitude of his requested sentence reduction. *Id.* So a defendant with years left on his sentence, like Rathburn, must show that his

25

reasons for release are so powerful that they "warrant" a "reduction" of that size. *Id.*

Consistent with the Court's analysis of the § 3553(a) factors after Rathburn's trial, the Court should find that Rathburn is not eligible for release. In particular, 'the nature and circumstances" of his offense and his "history and characteristics" both tilt the scales strongly against release. Rathburn's fraudulent scheme was egregious—and not just in terms of its duration (over a decade) and monetary damage (millions of dollars). Rathburn made conscious choices that endangered the health of his customers, medical professionals—many of whom are likely now involved in fighting the Covid-19 pandemic. And Rathburn's egregious disregard for the human dignity of individuals who donated their bodies to science continues to pain family members of the individuals whose remains he mistreated. After notifying victims of Rathburn's crimes of his motion for release (as required by statute), the government received several communications from family members whose loved ones' remains were stored in Rathburn's warehouse and used as part of his illegal business; these individuals are all dismayed at the potential for Rathburn's early release, and request that the Court reject his motion.

Beyond his crimes, Rathburn has further displayed characteristics that make him unworthy of release. He was unrepentant during his sentencing allocution, refusing to acknowledge his crimes and offering a rambling defense of his actions that contradicted facts proven at trial. (See ECF No. 182, PageID.3409—3435.) And, as previously noted, the Court revoked Rathburn's bond and incarcerated him before trial after a hearing in which he was found to have violated no-contact order and to be a "clear and convincing danger" to a co-defendant. Finally, his dismissive attitude towards health and safety measures would make him a danger to the community if he were released in the midst of a pandemic.

### D. The Court should decline Rathburn's request for a recommendation that he be granted home confinement because he is not suitable.

The Court should also deny Rathburn's request for a judicial recommendation to the Bureau of Prisons that he finish his sentence under home confinement because (even assuming the Court has the authority to grant such a recommendation) he is not a suitable candidate for such relief.

The facts already described explain why Rathburn cannot be trusted to observe conditions of home detention.  The nature of his crimes and his violation of his conditions of pre-trial release demonstrate that he is incapable of respecting both court orders basic health and safety precautions.

## III.  If the Court were to grant Rathburn's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Rathburn's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Rathburn's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

s/ Timothy J. Wyse
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9144
Timothy.Wyse@usdoj.gov

Dated: December 18, 2020

## Certificate of Service

I certify that on December 18, 2020, I electronically filed this motion for the United States with the Clerk of the United States District Court for the Eastern District of Michigan using the ECF system, which will send notification of such filings to all attorneys registered to receive filings for this case.

I further certify that I have also caused to be mailed by U.S. mail the Government's response to the following non-ECF participant:

> **Arthur Rathburn**
> 54353039
> LORETTO
> FEDERAL CORRECTIONAL INSTITUTION
> Inmate Mail/Parcels
> P.O. BOX 1000
> LORETTO, PA 15940
> PRO SE

> /s/ Timothy J. Wyse
> Assistant United States Attorney
> United States Attorney's Office
> Eastern District of Michigan
> 211 West Fort Street, Suite 2001
> Detroit, MI 48226
> Phone: (313) 226-9144
> Email: Timothy.Wyse@usdoj.gov